THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ ÁNGEL LLANOS GUERRA, Defendant and Appellant.

No. CR-66-375.     Decided June 28, 1968.

*Edna Abruña Rodríguez, E. Armstrong Watlington,* and *Enrique Miranda Merced* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Ida Cardona Hernández, Assistant Solicitor General,* for The People.

## JUDGMENT

In a prosecution against appellant for murder, the victim's son testified as witness for the prosecution, setting forth the manner in which his father died.[1] The Prosecuting

---

[1] In defendant's brief the testimony of this witness is summarized thus:

"TESTIMONY OF THE WITNESS PEDRO JUAN RAMÍREZ—He lived with his father at 287 Fajardo Street, in Villa Palmeras.

"On April 28, 1965, between seven thirty and eight, he was in the room where he lived with his father, waiting for him to finish making coffee, so that he could cook dinner, when defendant entered. That he was taken by surprise, and then the defendant threatened him with a knife which the witness stated was six inches long. That he told him to be quiet, that he was going to assault his father. That defendant grabbed a pipe which they used for construction, and struck his father with it. That then he pounced upon defendant, but since the man was bigger and stronger than he, he threw him against the floor and struck his father again, and then he searched his pockets and took out his watch and other documents. That he tried to run out, but the hem of his pants got tangled with the door, and then the defendant warned him that if he said anything he would kill him, his sister, and his fiancée. That defendant warned him that when anybody would come and ask for his father he should say that he had gone out to some town in the island to see a sick sister. That then he left the house and stood below and stayed there for fifteen or twenty minutes, and then he

Attorney presented in evidence a letter which was allegedly written by the defendant. In it he makes a confession of the crime and incriminates another person; it is addressed to "batata" and signed "Cheo." Evidence was presented to the effect that defendant is known as "Cheo." In order to

saw defendant leave the house but without his father. That then he returned to the house and did not find his father, he began to look for him but in vain, he did not find him in the house or in the surroundings. That then he went out again and the defendant threatened him again. That he threatened him constantly.

"That on May 6, his aunt told him to open the outhouse and that when he did so, he found his father there.

"He testified that two months or two and a half months after the death of his father, he was in El Comandante racetrack, when a man came up to him and put a letter in his pocket. That he read it and put it in his shirt pocket. That later he gave that shirt to his fiancée to be washed.

"He testified that it was not till they found his father's corpse that he spoke about what had occurred, for he was terrified by the threats uttered against him.

"On cross-examination he testified that on the same day of the events, defendant had been in his house and had offered him some things for sale; but that his father did not buy him anything, because the money he had was to buy cement.

"That the day after the events, that is, Thursday 29, he left his house at about 9:00 in the morning and saw defendant in front of a furniture store. That the defendant threatened him again. (Tr. Ev. 149.) That behind defendant there was a man with a patch and sunglasses. That then defendant told him that they were going to Banco Popular of Barrio Obrero. That when they reached the bank, defendant took out of his pocket a notebook which belonged to his father. That it had two slips signed to withdraw money from the bank. That one slip was to withdraw $125 and the other to withdraw $185 (Tr. Ev. 153). That he gave him the slip to withdraw $125 and he did so, and when he came out of the bank, the defendant took the money and notebook away from him and put everything in his left pocket. That later defendant and his companion got into a taxi which was heading for Cantera. That later he returned to his house but did not notify the Police; that he was in his room till seven in the evening when he went to his fiancée's house, and later returned to his house again.

"On Friday 30, he left his house about 9:00 or 10:00 in the morning and went down and when he reached Edna Street at the corner of Fajardo Street, he ran into the defendant, who threatened him again. That after this occurred, he went to his fiancée's house and did not return to his house. That he was there till about six, and as he left he ran into the defendant again in the corner. That he entered a bar (Bar Lucerito de Abril) and he

establish that the handwriting of the person who wrote the letter belonged to the defendant, two documents were presented in evidence, Identification L, Exhibit XI (an exemplar of defendant's handwriting, written by him while he was copying what his counsel was dictating to him from

---

was there several minutes. (Tr. Ev. 179.) That when he left, defendant was in Mueblería La Torre, and he crossed the street and went to him and threatened him again. That later he took a taxi, and went to his sister's house, Isabel Ramírez Castro, in Vistamar; but when he reached there his sister had quarrelled with her husband and did not pay any attention to him and so he left. (Tr. Ev. 182.) That since his sister did not pay any attention to him, he did not say anything to anybody. That later he went to a neighbor's house to receive his sister's telephone call and he saw television, returning to his room about 9:00 p.m.

"On the morning of Saturday, the 1st, he went to his fiancée's house. That he went to visit Mrs. Borrero. That on that day at 10:00 in the morning, he ran into the defendant again, and the latter threatened him again. That then defendant went away and he went to María Coella's house. There he talked for a while and went to Andrea's house for lunch. Later he went to his fiancée's house awhile, and he returned to his room. That that Saturday at night about seven, he ran into defendant again and the latter threatened him again. That that night he went to bed about 10:30.

"That on Sunday he got up early, and from ten to eleven in the morning he saw the defendant and the latter threatened him. The same thing occurred that evening and that night.

"That on Monday, May 3, defendant took him to the bank again. That that occurred about ten thirty more or less. That when they reached the plaza in front of the bank, he gave him a signed paper so that he would withdraw money for him. That he entered, and signed, and they gave him $185. He left the bank about ten minutes later, and gave defendant the money.

"On Tuesday, he got up about 10:30 in the morning. That day he left the house and went to a racing agency, and when he reached the Bar 'Los Muchachos' he saw defendant in front of a bazaar. That defendant whistled to him, and since he did not go to the defendant, the latter went up to him. That defendant gave him a small piece of paper and told him to buy some cresol. That he entered the pharmacy store and bought half a dollar's worth of cresol, which was what was stated in the paper. That defendant took the package and went towards Tapia Street. That he returned to his house and later went to Sixta Borrero's house. That he returned to his house and stayed there. That that night he heard noises in the patio.

"On Wednesday, his aunt Carmen came to ask for his father and they went to the police station. His aunt Josefina had already gone to his house. On that day the police were in his house and began an investigation in connection with his father's disappearance, but on that occasion he said nothing about what was happening. That on that same afternoon he

the letter which was signed "Cheo"), and Identification O, Exhibit XIII (exemplar of defendant's handwriting submitted to defendant's counsel by his father), as well as the handwriting expert's report which determined that the three documents had been written by the same person.

On appeal, the only error which is assigned is related to the admission in evidence of the documents marked Identifications L and O, already mentioned. Appellant maintains that their admission in evidence was erroneous, since it was confidential material of the defense. The question thus arises, according to the conflicting versions set forth by the prosecuting attorney and the defense.

The prosecuting attorney maintains that he told defendant's counsel that he possessed an incriminating letter signed by "Cheo," and he suggested him to obtain exemplars of defendant's handwriting to submit them to an expert in order to determine whether that letter had been written by the defendant, and if it had not been written by the latter, that would benefit the defendant and it could be used in his defense but, if on the contrary, the handwritings were the same, the prosecuting attorney would present the letter as evidence for the prosecution.

---

received a telephone call and that defendant was the one who called him. That on that occasion he called him to ask him what were the police doing in front of his house.

"On Thursday his aunt Carmen visited him again, about twelve thirty. That he told his aunt that for two or three days he smelled a stench; but that he thought it was produced by dead mice (Tr. Ev. 293). That they began to search and opened the door of the outhouse, and when it knocked against the toilet he saw his father's leg. That then he fainted. That they took him to his fiancée's house where they took care of him because of his nervousness.

"That then they took him to the police station of Barrio Obrero, and then to the general headquarters, where they interrogated him. That then he talked with his aunt and after this conference he stated all he knew.

"That he went with Detective Pizarro to the area of Villa Palmeras and Lloréns Torres, looking for defendant. That they searched for him for two or three hours. That defendant was at the corner of Río Grande and Edna Streets. That then the police arrested him."

The defense's version is in the sense that after he found out that the prosecuting attorney possessed the incriminating letter, which was given to him by the prosecuting attorney so that he would examine it, counsel told the latter that the defendant denied having written the letter, but that he was not in a position to prove by way of an expert that defendant did not write the letter because he did not have the means to retain one, and that then the prosecuting attorney told him that the police expert would offer him the services free of charge, and for that reason he gave the prosecuting attorney the Identifications L and O, but not for the People to use the expert's report if it resulted adverse to defendant.

The question thus raised was reduced to settling a conflict of fact, and the trial judge settled it against the defendant and gave credit to the prosecuting attorney's version.

The judgment rendered by the Superior Court, San Juan Part, on October 4, 1965, will be affirmed.

It was so decreed and ordered by the Court, as witnesses the signature of the Chief Justice. Mr. Justice Santana Becerra, with whom Mr. Justice Hernández Matos concurs, dissented in a separate opinion. Mr. Chief Justice did not participate herein.

(s) LUIS NEGRÓN FERNÁNDEZ
*Chief Justice*

I attest:
(s) JOAQUÍN BERRÍOS
*Clerk*

—O—

MR. JUSTICE SANTANA BECERRA, with whom MR. JUSTICE HERNÁNDEZ MATOS concurs, dissenting.

San Juan, Puerto Rico, June 28, 1968

I believe that in this prosecution and conviction for murder in the first degree, there was an absolute denial

of a fair and impartial trial in the trial court. The evidence, on the fact of the death itself, was circumstantial.

To substantiate the previous conclusion of absence of a fair and impartial trial, I shall set forth the following facts as they appear from the record:

—1—

Witness Pedro Juan Ramírez, son of the victim, testified that sometime after his father's death, a "guy" came up to him while he was in the El Comandante racetrack, and put a letter in his pocket which he told him to read. The witness forgot about the letter, and gave his shirt to his fiancée Margarita Rodríguez, so that she would wash it. (Tr. Ev. 85–86.) Witness Margarita Rodríguez testified that she saw the letter on May 28, 1965, in the pocket of the shirt which her fiancée, Pedro Juan Ramírez, gave to her. She warned one of the victim's sisters. (Tr. Ev. 351–353.) The victim's sister, Isabel Ramírez, testified that on May 28, 1965 Margarita Rodríguez gave her the aforementioned letter and she immediately called Detective Pizarro to whom it was given the following day. (Tr. Ev. 355–358.) Detective José Miguel Pizarro testified that on May 29, 1965 Isabel Ramírez gave him the aforementioned letter and he gave it to Prosecuting Attorney Felipe Ortiz Ortiz. The letter was taken later to the police laboratory. He could not specify the exact moment but he stated that he gave the letter to Prosecuting Attorney Ortiz at the beginning of June, in the first 3 or 4 days. It could have been before June 7. On this date, a preliminary hearing was held. (Tr. Ev. 372–380.) The defendant had already been arrested since May 7, 1965. This letter was marked *"Identification H"* of the People.[1]

---

[1] The text of "Identification H" is the following:

"Listen batata, tell your big bum brother to help you, because I am in prison and without salvation, for your brother told me to kill the son also, and I did not pay any attention to him. So, tell him to help you, if

—2—

Prosecuting Attorney Eugenio Ramos Ortiz, who was conducting the case, called witness Mariano Caballero Pintor to the witness stand. The witness identified himself as a prison guard of the State Penitentiary who had the custody of the prisoners who were taken to the courts. The defense raised a contention as to the matter about which this witness would testify, on the grounds of its confidential nature. This contention provoked a lengthy debate (Tr. Ev. 390–431) in the absence of the jury.[2]

Witness Caballero Pintor testified that he observed the conference between Mr. Kolthoff, counsel of legal aid, and defendant, at a distance of three feet. This conference took place in the marshal's office near a cell behind bars, where defendants brought to court are placed. It is in this office the witness said, and due to the custody precautions, where those interviews ordinarily take place. Counsel asks the marshal or the prison guard for permission to take defend-

not I shall talk and accuse him, because while I was killing the old cuckold he was waiting for me inside the outhouse. Imagine, batata, if I would have taken the advice of your brother, everything would have come out all right, because big bum told me to kill the son too, and I told him that it was not necessary, and now I am sorry I did not do it because your brother was the one who helped me to get him into the outhouse, so he is as guilty as I am. For afterwards the son came out stiff, for that guy is the biggest coward teenager I have seen. Batata, what I am going to tell you today in detail, listen broth [strike over in the original] batata, burn this paper. Batata, do not worry, that if everything comes out right, I have some money saved, and I am going to give it all to you because I want him to be killed, but I want them to believe it was suicide. O.K. old batata. Give my regards to all my pals. Affectionately (Sgd.) Cheo."

[2] Even though the trial judge stated that he and the other judges would guarantee indigent defendants the confidential conference with their counsel of legal aid in the premises of the court, which we do not doubt, non-indigent defendants ordinarily on bail had their conference in the offices of the retained attorneys, as the judge stated, the result of the debate convinces us that there are no physical facilities for these conferences between counsel and client in the court, without the near presence of witnesses, stenographers, reporters, or other officials and employees, as the facts of this very case reveal.

ant out of the cell; the marshal opens the cell and after putting the handcuffs on him, whenever necessary, he permits the conference at a desk located there for those purposes. The witness testified that the space was 12 feet wide and 14 or 16 feet long, with 4 desks and their chairs where employees of the marshal's office worked, and other persons were there as well as the prison guard witness himself. He saw Mr. Kolthoff pull out a sheet from a notebook and handed it to defendant to write on it. Defendant first wrote on it with a pencil which was on the desk and then he wrote again with a green ball-point pen with a silver top which was given to him by counsel himself. While defendant was writing he heard them murmuring, but he could not tell what they were talking about. (Tr. Ev. 431–465.)

This document, written there by defendant, and identified by witness Caballero Pintor, was marked *"Identification L"* of the People, and it was eventually admitted in evidence with defendant's objection.[3]

—3—

When witness Mariano Caballero Pintor finished testifying, Prosecuting Attorney Ramos Ortiz presented the testimony of Prosecuting Attorney Felipe Ortiz Ortiz. Prosecuting Attorney Ortiz Ortiz stated that he was the one who

---

[3] "José A. Llanos Guerra—43710 Victor Llanos Guerra—Dear brother —I hope to God that when you receive these humble words you will be enjoying all of your wishes as well as the old man, and others. Brother, I finally received word from you.

. . . . . . . .

"For Batata—Listen, batata, tell your big bum brother to help you, because I am in prison and without salvation, for your brother told me to kill the son also, and I did not pay any attention to him. So, tell him to help you, if not I shall talk and accuse him, because while I was killing the old cuckold he was waiting for me inside the outhouse. Imagine, batata, if I would have taken the advice of your brother.—Víctor Manuel (.?) Colón—Box 545—Galera 404—Río Piedras, P.R.—José A. Llanos Guerra— Building No. 80 Apt. No. 1525 Caserío Luis Llorens Torres, Santurce, Puerto Rico."

investigated the case. He was Prosecuting Attorney since 1962, and before that he had been District Judge for several years. He identified *"Identification K"* of the People as a document which defendant signed in the presence of Judge Nilda Cortiella Saavedra, who presided at the preliminary hearing, in the presence of his counsel and the Prosecuting Attorney. This *"Identification K"* is a carbon copy of the original document, *"Identification Q,"* which was eventually admitted in evidence.[4]

Prosecuting Attorney Ortiz Ortiz identified the documents M-1 and M-2, original and carbon copy of a printed mimeograph form requesting a reduction of the bail, dated May 27, 1965, and its original and copy were signed by defendant José A. Llanos Guerra. This document bears a seal of the District Jail, and is countersigned by a record officer. Prosecuting Attorney Ortiz Ortiz testified that he sent to the Division of Doubtful Documents of the Police *Identifications Q, M-1 and M-2,* together with a letter, *"Identification H,"* which he said he received from detective Pizarro. The result of the calligraphic study of the police laboratory on the letter, *"Identification H"* and on the other documents submitted was negative. The Prosecuting Attorney as well as counsel for the defense verified it to be so in the office of the Prosecuting Attorney. Prosecuting Attorney Ortiz Ortiz showed the letter, *"Identification H"* to the defense, and they reached a certain agreement as to said document.

*"Identification L"* was shown to witness Prosecuting Attorney Ortiz Ortiz. This is the handwriting taken by counsel for the defense from the defendant during the conference in the marshal's office, to which witness Caballero Pintor referred, and which he identified because he was present nearby.

---

[4] *"Identification Q"* is a printed form for a sworn statement in which defendant writes in his own handwriting the following:

"Relying on my constitutional right, I refuse to testify on my counsel's advice. (Sgd.) José A. Llanos Guerra. Sworn to and subscribed before me, today June 7, 1965. (Sgd.) Felipe Ortiz Ortiz."

The Prosecuting Attorney said that that *"Identification L"* had been given to him by Mr. Kolthoff. Prosecuting Attorney Ortiz Ortiz also identified another document which was marked *"Identification O"* of the People, and which was described as a document which was attached or stapled to *"Identification L,"* which was given to him by Mr. Kolthoff.

Prosecuting Attorney Ortiz Ortiz testified that he reached an agreement with the defense to submit to the handwriting expert of the Police, *"Identifications H, L, and O"* for study, to see whether the handwriting of the person who wrote *"Identification H"* corresponded to the handwriting of the person who wrote *"Identifications L and O."* (Tr. Ev. 479–480.) He stated that the purpose was that if it were not the same handwriting, the defense would use the report for its own benefit, and if it were determined that it was the same handwriting, the People would use it. The report in this second occasion was positive as to the identification of the handwritings.

Prosecuting Attorney Ortiz Ortiz filed a motion before the court on the summoning of additional witnesses, including witness Margarita Rodríguez, who presented *"Identification H"* and police expert Viñas, who submitted the report. This motion was filed on September 1, 1965. The Prosecuting Attorney stated that he and the defense spoke on various occasions about the report of the calligraphic evidence also in the presence of other persons. We copy from the record: (Tr. Ev. 485 and 487)

"Q. Did you say anything on that day to Mr. Kolthoff or to Prosecuting Attorney Dueño, in the presence of Mr. Kolthoff?

A. [Prosecuting Attorney Ortiz Ortiz] On various occasions my colleague had gone to my office so that I would return the writing which he had given me, to return the two writings which he had given me of the exemplars of Llanos Guerra. I told him that I refused to return them to him. He insisted to the point that he told me that I had to return them to him by any means. Then I told him that it could not be that way, then. . . .

Q. Not that way?

A. That the documents could not be returned to him that way, by any means, they had to be returned on friendly terms. Then he told me, 'well, I will go where necessary, because those documents belong to the defendant, they are privileged property of the defendant and I do not have the authority to hand them in.' 'Then, let us go to Prosecuting Attorney Dueño.' Before going to Prosecuting Attorney Dueño, I told him the reasons he gave me the last time so that I would return them to him, which were the following, that now he was not the only counsel in the case because defendant's relatives were planning to retain or had retained, I do not recall very well, Attorney Roberto de Jesús Cintrón, that the situation had changed now because he, Mr. Kolthoff, had spoken with Mr. De Jesús, and the latter told him that he had been very naive in giving me those documents, and that . . . well, with that situation we went to Prosecuting Attorney Dueño, we spoke to him, I advised my colleague to file a motion before the court, in view of his attitude, to elucidate whether that seizure of those documents was legal or illegal. Well, we went to Prosecuting Attorney Dueño. . . .

JUDGE:

On what day was that?

A. After . . . , I do not recall the day, Your Honor.

Q. More or less?

A. It was after I had received the results of the calligraphic analysis, the last one made by expert Viñas, Your Honor.

Q. Which is dated August 13.

A. Yes, Your Honor, the last one.

Q. About how many days later, that is, how many days, more or less?

A. A short time ago, Your Honor, frankly I. . . .

Q. It is September 23, and the report is dated August 13, the report was submitted a month and ten days ago, let us see, more or less, how many days after that day August 13, more or less?

A. A few days later.

Q. A few days later?

A. Yes, Your Honor, I never jotted down the date of any of those things, of the conferences I had with my colleague.

Q. You did not jot down any dates?

A. Not the dates in which I saw my colleague, Your Honor.

PROSECUTING ATTORNEY:

What was the result of that interview with Prosecuting Attorney Zoilo Dueño?

A. Counsel for the defense set forth there before the District Attorney the same reasons he had given me; he also elaborated on and stated another reason, that he was being interviewed by Mr. Justice Hiram Cancio, for the office of law clerk, or something like that, and that that could prejudice him. After hearing my arguments and his, Prosecuting Attorney Dueño told him that the correct thing for him to do was to file a motion before the court so that the situation would be elucidated, and then the interview ended."

*Cross-examination of Prosecuting Attorney Ortiz Ortiz*

Prosecuting Attorney Ortiz Ortiz was submitted to an elaborate cross-examination by Mr. Kolthoff, on facts which the Prosecuting Attorney denied or said he did not remember having taken place in the relationship between them, as colleagues and as attorneys in the proceeding.

Prosecuting Attorney Ortiz Ortiz sets forth the following in the record at page 495:

"A. Everything that the colleague has said about the conversation with respect to the case occurred after I had the letter. One day I called my colleague and told him, 'Listen . . .'—after those negative results were received—'there is a letter here. The purpose of an attorney—he will correct me if it is true or not—is to do true justice, it is not to win the case or to have cases acquitted, since I have this letter and I sent those documents, and the evidence is insufficient, we are going to submit these documents to analysis, you speak with the defendant.' He told me that the defendant always alleged he was innocent, 'then talk to the defendant, and after he gives the exemplar voluntarily, we can analyze it and determine whether that is his handwriting, we are going to speak to him to explain and to do true justice,' and I told him, more 'if you continue with the case, I am willing, although this is a case of murder in the first degree, to talk so that it can be reduced to murder in the second degree, later, if it is continued, because I doubt that the case will be continued after they make a negative analysis with that letter.' That occurred after I received the letter, that was when promises

were made to him, and we both talked, and he said, 'I am going to talk with the defendant,' and then he talked with the defendant and later he talked with me, and said, 'the defendant insists that he did not write any letters,' and I told him, 'here is the letter,' I surrendered my evidence and gave it to my colleague Kolthoff; my colleague Kolthoff took it with him. . . .

JUDGE:

Q. The original copy of the letter?

A. Yes sir, I surrendered it, Your Honor.

Q. Identification H?

A. Yes, sir, I surrendered it and gave it to him, 'take it to him, show it to the defendant to see whether defendant does not agree, and if the defendant insists that it is not his handwriting, then bring the exemplar to me, if it is not his handwriting, then we shall see what can be done in this case.' My colleague Torres González had come to court and had told the colleague, because the colleague himself told me, that indeed evidence was being looked for, if it were determined that that evidence discharged the defendant, the case was going to be dismissed. He told me that.

JUDGE:

Mr. Kolthoff?

A. Yes sir, Mr. Kolthoff told me that, he requested continuance, and he told me that they were looking for an evidence, and if it were found and if it exonerated the defendant, the case would be dismissed. Mr. Kolthoff told me that. That is the situation.

JUDGE:

You can continue the cross-examination.

A. By the way, they recriminated that I had given that evidence to the other Prosecuting Attorneys, that I had surrendered a piece of evidence and had given it to him, that the defendant could have torn it, and that that was very ignorant of me, and I said that I am acting out of good faith and I want justice to be done, that is why I did it."

Prosecuting Attorney Ortiz Ortiz accepted that defendant had signed *Identification Q* at his request, in the District Court, but it was done in the presence of the defense and without any threats or offers from the Prosecuting Attorney.

On July 14, 1965, first date set for the trial of this case, the Prosecuting Attorney had not shown *"Identification H"* to the defense. The Prosecuting Attorney did not recall whether on that date, July 14, the calligrapher had submitted the report on the documents which had been submitted to him. The report is dated June 18. The Prosecuting Attorney did not recall whether it was on August 5, 1965, after the first setting of the case for hearing, that he showed the letter *"Identification H"* to the defense.

He accepted that he had asked the defense to go to his office to talk about said letter. (Tr. Ev. 508.)

[Prosecuting Attorney Ortiz Ortiz]: "I know that I invited, that I went to look for my colleague to talk about this letter, I do not know whether I expressly showed it to him in his office, or whether we went to mine, I know that my colleague went to my office and I spoke to him about the contents of the letter, I do not know whether it was on that day."

.        .        .        .        .        .        .        .

"DEFENSE:

Can my distinguished colleague tell this court whether that day, August 5, I presented myself in his office, at his request, in the morning before the trial began?

PROSECUTING ATTORNEY:

At whose request?

DEFENSE:

At my request, whether he went to look for me in my office, and told me that he wanted to talk with me confidentially.

A. I know what happened, but I do not know on what date.

Q. Will my distinguished colleague be kind enough to tell this court whether on that occasion that I went to your office, at his request, at the request of my distinguished colleague, did Prosecuting Attorney Felipe Ortiz tell you that he had discovered a very incriminating letter, which he wanted to show to me, since he knew that both of us represented justice and that we wanted justice to be done, he wanted me to see it, to show it to the defendant, so that if he admitted that the letter was written by him, he was willing to offer him after making his

plea, a plea of guilty, to reduce the crime of murder to murder in the second degree?

A. I want to tell you that it is true that on one occasion, I do not recall whether it was on the day my colleague mentioned, I telephoned my colleague and told him about that incriminating letter, and it is true that I told my colleague that he, as well as I, should be led by our desire to do true justice, and that I wanted to show him the letter, that I was going to give it to him to show it to defendant, and I . . . , then I surrendered it to him so that defendant could see it, and then to see whether the defendant would voluntarily give exemplars of his handwriting to compare it, and afterwards, if it were determined that the results were positive, I could use it and if they were negative he could use it, and that I would handle it with the District Attorney, and also if the case were continued, if it were decided to continue it, I would be willing to talk with the District Attorney so that the case be reduced to murder in the second degree.

JUDGE:

Fine.

DEFENSE:

Does my colleague the Prosecuting Attorney want to tell this court that on that date in that interview he asked me, he made a deal with me to bring to him exemplars of defendant's handwriting?

A. Oh, no, no, not a deal, to take the letter, to submit it to the defendant so that he would know about it, and if he wanted to give exemplars, after seeing it, he could give them, I believe that is how it occurred.

Q. You believe it occurred that way?

PROSECUTING ATTORNEY:

Let him finish.

JUDGE:

Did you finish?

A. That is my best recollection.

DEFENSE:

Mr. Ortiz, tell me specifically whether you recall that our conversation of that day was limited to asking me to show said letter to Llanos Guerra, and that if he admitted its authenticity, you were willing to give him a second degree?

A. Oh, no, I was willing to intervene with the Prosecuting Attorney to give him the second degree; I was always willing, even before this trial began, because of other considerations, but I also wanted an exemplar of the letter so that if a third party was involved, I wanted my conscience to be satisfied, because I was led by the aim of doing justice, of sleeping calmly, that an innocent person should not go to jail. I was going to talk with the District Attorney, but this notwithstanding, if the District Attorney did not agree for some reason, in view of the other evidence, I would be willing to take steps to obtain a second degree; I mean, to recommend it.

Q. Then I am asking my distinguished colleague whether his statement under oath to this court is that on that occasion he told me that he wished to have exemplars of defendant's handwriting to compare them with the letter?

A. I believe so."

.        .        .        .        .        .        .        .

"Q. Does my distinguished colleague recall, and if so, if you will please tell this court, whether or not it is true that when I interviewed the defendant, I spoke to him again and told him that the defendant entirely denied the contents of the letter, and that therefore, I appreciated greatly your offer of second degree, because he did not accept it?

A. On what occasion?

Q. On the same day, at about ten thirty in the morning on that 5th day I am talking about.

A. Well, on that day I do not recall whether you told me so, I know that my colleague has always told me that the defendant does not accept second degree, every time he has referred to that, he has always told me the same thing, that he does not accept the second degree, yes, that is correct; on some occasions he has told me that, the same thing.

Q. Does my distinguished colleague recall whether later in the morning of that same day I spoke to you and told you the following, 'Felipe, I would like to see that letter again if you would lend it to me,' does my colleague recall that?

A. I do not recall that specific detail.

Q. Does my colleague recall that you told me that you would lend it to me because you trusted me, and you told me to continue my efforts as to Llanos Guerra and to see whether he wanted a second degree instead of a plea of guilty?

A. I do not recall that specific detail, but as I have always told my colleague, I have always trusted you, it is true, and as to the second degree, everytime that I have spoken to my colleague I have told him that, for other reasons I do not believe. . . . ''

Prosecuting Attorney Ortiz Ortiz accepted that Mr. Kolthoff had returned the letter to him, and that some days later the defense and he spoke about handwriting experts of the Police of Puerto Rico and of the F.B.I. After a prolonged examination on facts which allegedly occurred between counsel for the defense and the Prosecuting Attorney, which Prosecuting Attorney Ortiz Ortiz did not recall, the latter stated: (Tr. Ev. 523)

"Q. Does my distinguished colleague recall whether at that time I gave him some duly folded papers to give to Mr. Viñas?

A. [Prosecuting Attorney Ortiz Ortiz] I do not, I know that my colleague gave me some documents, I do not know whether it was on that day, I just know he gave me some documents which are there, that they were identified by the People, it was not under the conditions or in the manner stated by my colleague.

Q. Does my distinguished colleague recall whether you gave those documents to Mr. Viñas?

A. I believe so, yes. I mean, those documents which my colleague gave to me.

Q. Can my distinguished colleague tell this court whether he told Mr. Viñas to whom they belonged, and what was the purpose of those documents?

A. I told him what I wanted him to do with those documents.

Q. What you wanted him to do with those documents?

A. To analyze them, to compare the handwriting of the letter to see whether it belonged to the same person, that is what I told him.''

After answering that he did not recall other facts, Prosecuting Attorney Ortiz Ortiz said: (Tr. Ev. 528–529)

"A. Those two which my colleague has; all I know, Your Honor, is that as soon as my colleague found out by some means and went to my office, and I told him I was going to use that, he told me that I had to return it to him because it belonged to the defendant, and that the latter had not given him permission to

give those documents to me, and that I had to return them to him; that occurred on various occasions, and finally he told me that I had to give them to him by any means. My colleague always insisted that that was defendant's privileged property, and that he had not given him permission, he always insisted on that, that is correct, Your Honor, as to those two documents.

DEFENSE:

Q. Tell me, my colleague, whether on that occasion, September 1, to which I referred previously in my question, you returned those documents to me?

A. I?

Q. Yes.

A. No, I refused to give them to you.

Q. Can my distinguished colleague tell me whether this was what I said, 'Felipe, are you aware of what you want to do?'

A. I do not recall that. Do you want me to tell you?

JUDGE:

Go ahead.

DEFENSE:

Does my colleague recall that I continued telling him, 'Felipe you are joking?'

A. I do not remember that. If my colleague wants me to. . .

JUDGE:

What?

A. If my colleague wants me to tell him what I recall . . .

Q. What do you recall?

A. My colleague told me on that occasion that I could not use those documents because they were privileged property, defendant had not given them to be used, and that he did not give them to me so that I could use them against defendant in a trial."

The Prosecuting Attorney continues testifying: (Tr. Ev. 530–531)

"Q. Will my distinguished colleague tell this court whether I went to speak with him on various occasions so that he would return the document to me?

A. That is correct, Your Honor.

Q. Can my distinguished colleague tell me whether on those occasions I told him, or let him know, that when I gave him that

document to give it to Mr. Viñas, I did so trusting in his integrity in the same manner that he had trusted me when he gave me the letter which allegedly Llanos Guerra had written?

A. Your Honor, he told me, on that last occasion, just like that, in those very words.

Q. And does my distinguished colleague recall whether I told him that I was greatly surprised at such action on his part?

A. No, I do not remember his telling that.

Q. Does my distinguished colleague recall whether I specifically told him that I thought that was not very gentlemanly?

A. No, he did not tell me that, Your Honor.

Q. Does my distinguished colleague recall. . .

A. I mean, he did not tell me that in my office.

JUDGE:

Go ahead.

DEFENSE:

Does my distinguished colleague recall whether I told him that he was being disrespectful to his fellowship?

A. I do not recall that, Your Honor, I do not recall his saying that to me.

Q. Does my distinguished colleague recall whether he told me that he understood my situation, but that that was the only evidence that the People really had, and that he was not going to give it to me?

A. That is extremely false, Your Honor.

Q. Can my distinguished colleague tell me if on that occasion I told him that he had to give it to me by any means?

A. That about by any means you told me the last time, I do not recall whether it was then; that is, it was when we went to Mr. Zoilo Dueño González, I do not know whether it was then.

Q. Can my distinguished colleague tell me whether he took it as a joke and pushed himself backwards in the chair and said, 'no, not by any means'?

A. I did not take it as a joke, I never take things as a joke, and much less this juridical question; I told him that not in that way.

Q. Can my distinguished colleague tell me whether he recalls that yesterday in this court he said—not yesterday, but this morning—, that when I, he was joking?

A. No sir, I was not joking.

. . . . . . . .

Q. Does my distinguished colleague recall that later in the afternoon of that same day I saw him in the hallway and asked him if he was going to give me the documents or not?

A. I do not recall that, I just know that my colleague insisted many, many times that I return those documents to him.

Q. Can my distinguished colleague tell me whether he recalls having told me to understand his situation, that he could not give them to me, but if Mr. Zoilo Dueño would give permission then he would give them to me?

A. No sir, if we had already gone to see Prosecuting Attorney Dueño.

Q. Does my distinguished colleague recall whether I told him on that day that the compromise between him and me had been gentlemanly transacted, and in which your supervisor Zoilo Dueño did not have to intervene?

A. I do not recall that about compromise between gentlemen; yes, you told me that before, before going to Prosecuting Attorney Dueño's Office."

The Prosecuting Attorney accepted that he was acquainted with José Antonio Pagán as one of the persons present the day they talked with Prosecuting Attorney Dueño about the return of the documents. That the defense set forth the situation to Prosecuting Attorney Dueño, and that the witness stated the following during the interview: (Tr. Ev. 536)

"A. [Prosecuting Attorney Ortiz Ortiz] My contention was that the document, to which counsel for the defense has been referring, had been submitted to an expert examination so that he could use it if it were beneficial to him, and so that I could use it, that is, the People of Puerto Rico could use it if it were beneficial to it. That was my contention. My colleague's contention was that he had given it to me, not with the intention of yielding it, because he did not have defendant's permission, because it was privileged property, and that I could not use it, and that I was misinterpreting, that it was given to me solely and exclusively to determine whether it was the handwriting exemplar, that was always my colleague's contention. Of course, he used another argument which I have already said that it should not be referred to now."

•   •   •   •   •   •   •   •

"Q. Can my distinguished colleague say if I answered Mr. Zoilo that the court did not have to intervene in something strictly confidential which had been obtained without my consent, that it was going to be used illegally, that we did not want the court to intervene because there was no reason for it and that we were not going to do it?

A. I do not know, I do not recall the exact words, but I know that as to his suggestion, counsel for the defense told the Prosecuting Attorney that he maintained the position he had always maintained, that that document was privileged property, that the defendant had not given him permission to reveal it and that he had given it to Prosecuting Attorney Ortiz Ortiz, this deponent, but not to be used by me." (Tr. Ev. 537.)

Prosecuting Attorney Ortiz Ortiz said that he did not recall whether on September 10, as a result of the report, he asked the defense to take steps to convince defendant to accept a second degree, but he accepted that he was always willing to take steps to see whether the person authorized would permit a reduction in the classification of the crime, but not because of the documents, but for other reasons. (Tr. Ev. 540–542.)

"DEFENSE:

My distinguished colleague please tell me whether you know if I took steps with Llanos Guerra.

A. [Prosecuting Attorney Ortiz Ortiz] I do not recall whether you did, what I can say is that my colleague always told me that every time you spoke with the defendant, he refused to plead guilty of the crime of murder in the second degree, my colleague always told me that.

Q. Can my distinguished colleague tell me whether I told him that as a result of my steps with Llanos Guerra he insisted that he was not guilty and that he would not plead guilty?

A. Every time that my colleague spoke to me, he told me the same thing, that defendant insisted on that.

Q. Mr. Ortiz, tell me finally, whether up till Tuesday, September 21, I have kept insisting that said documents are confidential, that you had not been straight in not wanting to give them to me,

that you had obtained them illegally, without my consent, and that I insisted that you return them to me?

A. Yesterday afternoon, at the office of Judge Guillermo A. Gil, counsel for the defense accused me of lack of integrity; as to the other things, it is true that my colleague has always insisted that those documents are confidential and that he did not give them to me for my use, and that the defendant did not give him permission to reveal them.

Q. Can my distinguished colleague tell me then, whether at any time he complained to me saying that we had made a deal as to those documents?

A. I explained to my colleague on repeated and multiple occasions what the situation was, as I understood it, the situation, as I saw it, was that the analysis be submitted to handwriting experts so that, according to the result, the person favored by it would use it, but my colleague did not agree, that it could not be that way, because those documents were privileged property, that defendant did not give him permission, that he did not give them to me with the intention of my using them, that I was precluded from using them, and that I had misinterpreted him.

Q. Can my distinguished colleague recall the date on which he and I agreed to submit the documents to a handwriting expert?

A. I did not jot down any date, I did not imagine that this could reach this level, I know nothing, I do not recall the date, because I was not scheming a plan with the intention of deceiving him or benefiting myself at all, what I recall, Your Honor, is the gist of the thing, for what it was meant."

—4—

With respect to this incident, and when Prosecuting Attorney Ortiz Ortiz finished testifying, José Antonio Pagán testified that at that time he was a student of the Law School of the University of Puerto Rico, and was assigned to the Legal Defense of San Juan as part of his study clinic. He testified that he was present at the interview previously set forth between the defense, Prosecuting Attorney Ortiz Ortiz, and Prosecuting Attorney Zoilo Dueño. The defense's position was in the sense that those documents should be returned

to him because they were confidential and private property of the defendant; that the Prosecuting Attorney stated that he understood the defense's position, but that that was the only evidence he possessed and was not going to give it to him; that it was precisely on that evidence on which the case of the People rested and it would fall; Prosecuting Attorney Zoilo Dueño decided that he believed the document should not be returned; that perhaps Mr. Kolthoff should file a motion before the court because that was the evidence of the People; that Mr. Kolthoff explained to Prosecuting Attorney Dueño that he had lent a document to Prosecuting Attorney Ortiz Ortiz to give it to the calligrapher and that the Prosecuting Attorney refused to return it to him, and that Prosecuting Attorney Dueño decided that it should not be returned to him because it was already evidence of the People. The document was not delivered to him.

(Tr. Ev. 555.)

"DEFENSE:

Will the witness be kind enough to tell this court in detail everything you heard, the words spoken between the parties that day in the office of Prosecuting Attorney Zoilo Dueño, as far as my colleague recalls?

A. The manner in which the Prosecuting Attorney obtained the possession of the document in question was set forth.

JUDGE:

Who set it forth?

A. Mr. Kolthoff was setting it forth, he told Prosecuting Attorney Zoilo Dueño that he had given the document to the Prosecuting Attorney for the sole purpose that it be given to the calligrapher, since there were no other in Puerto Rico, and the only ones available were the ones of the Police, and that the Prosecuting Attorney said that he would give it to the calligrapher of the Police. Then when he explained the matter to Prosecuting Attorney Zoilo Dueño, the latter insisted that he could not give him the document, that if he wished he could request it by filing a motion before the court."

—5—

Counsel for the defense, Mr. Erick Kolthoff, occupied the witness stand with respect to this incident. He testified with respect to all those particulars as to which he had cross-examined Prosecuting Attorney Ortiz Ortiz, and the latter stated that he did not recall them or that they did not occur in that manner. He said (Tr. Ev. 564) that on June 7, date on which the preliminary hearing was being held, Prosecuting Attorney Ortiz Ortiz approached him in the morning and told him that he was worried because the Office of the Prosecuting Attorney requested that every person whom he interviewed and who refused to testify had to sign a paper stating that he refused to testify; that he had not been able to obtain in the case of this defendant Llanos Guerra that statement in writing and that that would prejudice him with respect to his supervisor, Prosecuting Attorney Zoilo Dueño; and he eagerly asked him to help him obtain that statement, and that that would not, in any manner, prejudice defendant. The defense did not know that on that date June 7, 1965, the Prosecuting Attorney already possessed the letter, *Identification H*, which Llanos Guerra allegedly wrote. The witness did not object, and in that manner defendant himself presented the document *Identification Q* of the People.[5]

Mr. Kolthoff continued testifying that subsequently Prosecuting Attorney Roberto Torres González told him that they had a clue, the result of which could produce the release of defendant, and asked him to acquiesce to the continuance of the case.

---

[5] If it is correct that it was the practice of the Office of the Prosecuting Attorney to request the defendant to give a *written* statement that he did not want to testify, the practice was against the constitutional right against self-incrimination, since that statement in itself constitutes a testimony. In effect, in this case the Prosecuting Attorney used a written testimony to compare defendant's handwriting with *Identification H*, a very incriminating document.

The defense acquiesced and the case was set again for August 5. Prosecuting Attorney Torres González did not tell him what the clue consisted of, or that they possessed it for more than a month, or that they were seeking a way to connect the letter, *Identification H*, with defendant Llanos Guerra. That on the morning of August 5, 1965, date of the second setting of the case, Prosecuting Attorney Ortiz Ortiz asked the witness to accompany him to his office because he had a very important document to show him; that he showed him *Identification H* of the People, a letter allegedly written by defendant Llanos Guerra. The Prosecuting Attorney gave him the letter so that counsel could talk with defendant, so that, after showing him the letter, he would admit a plea or accept a plea of guilty of a lesser offense, specifically of murder in the second degree. Counsel stated that that was a surprise for him. That his client always told him that he was innocent, and he was grateful to the Prosecuting Attorney for showing him the document. The Prosecuting Attorney warned him that the document was confidential; that he should not let anyone know because he could be prejudiced, as Prosecuting Attorney, if they found out that he had shown that document to the defense, and that he did so because he trusted the integrity of the witness.

The witness considered the possibility that if it were true the defendant might try to destroy *Identification H*, and he wanted to protect himself against the risk by informing it to the marshal and his supervisor. The Prosecuting Attorney gave him permission to show the document to defendant's father also, because this gentleman had often called on Prosecuting Attorney Aponte and on the Secretary of Justice, insisting that another investigation of the case be made because that one had been improperly made. Counsel explained to his supervisor in legal aid, what had occurred and the latter gave him permission to continue, but he suggested him to obtain protection from Marshal Rodríguez and he did so.

Llanos Guerra was given permission to go out under custody and then the witness spoke with the defendant. He showed him the letter and the defendant denied having written it. He spoke to him of Prosecuting Attorney Ortiz Ortiz' offer of giving him a second degree if he would make that plea, and the defendant refused to make it because he was innocent and had not written that letter. The witness told him that he wanted to tell him about that situation and that he would tell his father, as he did. He showed the letter *Identification H* to defendant's father. The latter objected to the letter and stated that his son was innocent, and he voluntarily offered to give a copy of his son's handwriting to counsel, and he did so. He gave him a letter written by Llanos to his brother.[6]

Mr. Kolthoff continued testifying that he spoke with Prosecuting Attorney Ortiz Ortiz before the trial began, and he explained to him that his client continued denying flatly that said letter was authentic; that he insisted that he was not guilty, and therefore, the defense would appreciate the Prosecuting Attorney's offer of a second degree if said plea were made, because "even if there were 25 authentic letters like that one, that is, if they were authentic, or if there existed twenty-five thousand more proofs against my defendant, it would be enough if my defendant insisted not being guilty for me to defend him to the end." At that moment he returned the letter *Identification H* to the Prosecuting Attorney. (Tr. Ev. 571–572.)

The hearing of August 5 was continued again at the request of the defense because of the testimony of a seemingly vital witness indicated by defendant, and the case was set for September 21. Defendant told the witness about his

---

[6] This letter, which defendant's father voluntarily gave to the counsel for the defense, is *Identification O* which is stapled to *Identification L* which the defense gave to Prosecuting Attorney Ortiz Ortiz for a calligraphic examination of the police.

concern because he believed that the latter was giving credit to the aforesaid letter, and he told him that he could prove to him that he had not written it. To convince him that he had not written it the defendant offered to write something to convince his counsel. In view of these facts, the defense asked the Prosecuting Attorney to lend him the letter *Identification H*, and then the incident already mentioned by witness Caballero Pintor, in which *Identification L* was produced in the office of the Marshal of the Superior Court, occurred. The witness offered him a page of his notebook and told the defendant what he should write. Then he told him to leave a space in blank, he offered his pen to him, and continued dictating to him. Other persons were present there, among them, prison guards and the witness Caballero Pintor. When the witness compared *Identification L*, he found dissimilarity in the handwriting, and this led him to believe that his defendant was not guilty. He sought an expert handwriting examination with the F.B.I. which was not possible unless he paid the expenses for bringing an expert from the United States. Legal aid could not pay for such expenses and he gave up the idea. Other comrades told him that the only handwriting expert they knew was that of the Police. Several days later he talked to Prosecuting Attorney Ortiz Ortiz in relation to the possibility of using handwriting experts of the police, and about the risk of doing so. The Prosecuting Attorney intimated that he could use them without any danger and that they should submit the report to him for his personal use. That a police expert was not forbidden from examining the document of an attorney with respect to his client, and from submitting a report to him without the intervention of the Office of the Prosecuting Attorney. (Tr. Ev. 575.)

Mr. Kolthoff testified that the Prosecuting Attorney offered to help him contact expert Viñas, of the Police, and that in effect said contact was made, and he definitively gave

Prosecuting Attorney Ortiz Ortiz *Identifications L and O,* so that the latter would give them to expert Viñas.

After these facts, on September 1, counsel learned about the Prosecuting Attorney's motion requesting more witnesses, among them, the prison guard Mariano Caballero Pintor, and expert Viñas. This alarmed him and he went to the Office of the Prosecuting Attorney. He asked Prosecuting Attorney Ortiz Ortiz about the reason for summoning Caballero Pintor and the handwriting expert, and he asked him whether that included the documents which he had given him. Prosecuting Attorney Ortiz Ortiz answered that he was going to use them. Counsel objected and said that those documents did not belong to the Prosecuting Attorney; that he had given them to him as an intermediary, so that he would give them to expert Viñas. That Prosecuting Attorney Ortiz Ortiz told him that he knew that, but that that was the only evidence which he had because he could not depend on the other witness, and that he was not going to give those documents to him. That he was not kidding. The Prosecuting Attorney's refusal to return those documents was absolute and he repeated it on different occasions when the defense dealt with the matter. They finally agreed to consult the matter with Prosecuting Attorney Zoilo Dueño. That it was after he heard the testimony in court of Detective Pizarro, the day before, that he became aware that Prosecuting Attorney Ortiz Ortiz possessed *Identification H* since May 29, that is, before June 7, when he requested his cooperation to convince defendant to sign the testimony which is *Identification Q.* The witness continued setting forth in detail all the efforts made by him which were unsuccessful to obtain the return of the documents, even with Prosecuting Attorney Dueño's intervention. Prosecuting Attorney Dueño also sustained that he was sorry, but they could not return the document to him, and suggested to submit a motion to the court. The witness told him that the court did not have to intervene,

since the latter had been a private and confidential transaction between the attorneys, within the confidence and integrity which existed between them. Those documents were never returned to him.

Mr. Kolthoff testified that since he understood the scope and unpleasantness of the situation, he always insisted that it be decided without it being revealed to the public (Tr. Ev. 584); that he sought to speak with the judge in chambers, he spoke with other colleagues of the Office of the Prosecuting Attorney, and with other attorneys.

When Mr. Kolthoff was cross-examined by Prosecuting Attorney Ramos, and asked whether Mr. Roberto de Jesús had told him that he had been naive in making public a document which belonged to his client, the witness answered that Mr. de Jesús had told him that he had been very. . . . (Tr. Ev. 593.) Mr. de Jesús was a friend of defendant's father.

What defendant wrote in *Identification Q* (stating that he would not testify) was also dictated to defendant by the witness. When questioned by Prosecuting Attorney Ramos, he reaffirmed that his only purpose in dictating to the defendant from the very text of *Identification H* and in giving the document to the Prosecuting Attorney was for the expert to establish the truth of what his client told him, which he considered to be essential for the best defense. That it was on September 1 he received his first surprise about what was going to happen with that evidence when he received Prosecuting Attorney Ortiz Ortiz' motion summoning those additional witnesses which included the handwriting expert and the prison guard. He then learned that the Prosecuting Attorney intended to use those documents which did not belong to him, which were defendant's private property, and since then he began to insist that they be returned to him.

The Prosecuting Attorney was not ruthless and did not

intimidate him, but he sought to obtain the documents gaining the confidence of the witness as a colleague.

He stated that he never told the defendant, nor intended to tell him, that as his counsel he was going to give those documents to the Prosecuting Attorney. The calligrapher never submitted a report to him on the result of the examination of those documents.

—6—

In view of those facts which the record reveals, the Superior Court admitted and permitted that *Identifications L and O* be given to the jury, as well as the testimony of the handwriting expert of the Police, Mr. Viñas, and the testimony of Caballero Pintor, the prison guard, with respect to the facts.

The court stated that the documents L and O had not been unlawfully seized by the Prosecuting Attorney, but that the latter took possession thereof because they were given to him by counsel for the defense. As to their being private property, the court concluded that since the defense had revealed the documents, they ceased to be privileged communications. (Tr. Ev. 603–605.)

In view of the facts in the record, the decision of the trial court presents very serious considerations in the administration of criminal justice in Puerto Rico.

Insofar as the Prosecuting Attorney did not steal those documents from the defense, nor did he obtain them by force and violence, I agree with the trial court in that the Prosecuting Attorney did not possess them *unlawfully*.

Its conclusion that it lost its privilege as a result of its divulgation is also erroneous. In this case the privilege of the communication protected defendant, and nobody, including his counsel, could reveal it *without his consent*.

Despite the foregoing, a more serious situation than the one presented by a technical problem of evidence on the divulgation of privileged communications was involved herein.

Was and is involved here: (1) the basic constitutional guarantee which protects a defendant against self-incrimination, and (2) the other basic constitutional guarantee which assures defendant a *clean*, fair, and impartial trial.

In reaching my conclusions I exclusively do so on the basis of the facts appearing from the record according to their version given by the Prosecuting Attorney, in all of that in which the version of both attorneys would seem contradictory.

In view of the facts in the record, my very sense of equity forces me to make the following statements, which I believe necessary in justice to the professional responsibility of counsel for the defense.

Whatever the initial error of this attorney, his inexperience or naiveté in making defendant write out *Identification L* when defendant ignored the purposes behind it, even if said purposes tended to resolve the counsel's own doubts as to the guilt of his defendant in view of his objections that he was not guilty, and his refusal to accept a plea of guilty of a lesser offense; whatever the initial error, the inexperience or naiveté of counsel for the defense in placing this document, together with *Identification O* which was the document furnished to the defense by defendant's father, in the hands of the Prosecuting Attorney and of the police authorities, without warning defendant that he would do so, the final undisputed fact in the record is that as soon as counsel for the defense became aware of the fatal consequences which his acts could entail when he was notified of the motion of the Prosecuting Attorney summoning additional witnesses, the witnesses Caballero Pintor and the expert of the Police, Mr. Viñas, counsel commenced a bold, but unsuccessful struggle, pathetic, judging from what the whole record reveals, in

addition to the transcribed portions, to obtain from the Prosecuting Attorney the return of that evidence in a desperate effort to protect his defendant, when the damage had not yet been consummated.

In the course of the prosecution, when the damage had not yet been consummated, counsel for the defense struggled tenaciously in a two-day debate (Tr. Ev. 389–602) objecting that the evidence be given to the jury.

In fairness to counsel for the defense, it was necessary to make this explanation of professional responsibilities.

It was a very harmful evidence which led to defendant's conviction. *Identifications L and O* were the ones which permitted defendant's identification with the incriminating letter, *Identification H*, when calligraphic tests with other documents had failed.[7]

Upon the trial court permitting the Prosecuting Attorney to make use of said evidence and that it pass to the jury under the circumstances set forth by the record, the constitutional right of the defendant against self-incrimination was violated; he was denied a fair and impartial trial, and was placed in a complete defenselessness in view of the fact that his own counsel gave that evidence to the Prosecuting Attorney.

That relationship of complete confidence, which leads a defendant to trust his counsel with heart and soul and without fear, that relationship which cannot be disregarded in the administration of criminal justice, was impaired with fatal consequences.

I dissent. This appeal involves much more than the manner in which a trial judge settled a conflict of credibility as to how some documents reached the hands of the Prosecuting Attorney. As I have stated, the violation of the constitutional

---

[7] It is proper to observe that defendant was told to write from dictation *Identification L*, part of the letter *Identification H*, and of part *Identification O*.

476

right of not incriminating himself, the denial of a *fair* trial, and the dissolution of the principle which underlies the relationship of confidence between the defendant and his counsel are involved herein.

The case, in my opinion, is more serious than that of those diverse situations in which the United States Supreme Court has held the absence of the due process of law and of a fair and impartial trial because of the Prosecuting Attorney's actions.

I would decree the granting of a new trial.